UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CAPRI MOBILE VILLA LLC,

Plaintiff,

v.

CITY OF PETALUMA,

Defendant.

Case No.  25-cv-09096-JSC

**ORDER RE: DEFENDANT'S MOTION TO DISMISS**

Re: Dkt. No. 20

Plaintiff Capri Mobile Village LLC, a mobilehome park owner in Petaluma, California, challenges Petaluma's mobilehome rent control ordinance under the Fifth Amendment's Takings Clause and the Fourteenth Amendment's Due Process Clause.  (Dkt. No. 18.)[1]  The ordinance prevents mobilehome park owners from raising rents over certain limits, and a 2025 ordinance amendment prevents park owners from resetting rent to market value when a homeowner sells the mobilehome.  Plaintiff asserts the 2025 amendment is an unconstitutional taking on its face and as applied, and violates Plaintiff's substantive due process rights.  Defendant moves to dismiss all claims.  After carefully considering the parties' submissions, and having had the benefit of oral argument on May 21, 2026, the Court GRANTS Defendant's motion to dismiss as to all claims. Drawing inferences from the Amended Complaint's allegations in Plaintiff's favor, Plaintiff has not alleged facts sufficient to support an inference its as-applied takings challenge is ripe, or an inference Petaluma's rent control ordinance is a *per se* taking, a regulatory taking, or a violation of Plaintiff's substantive due process rights.

**BACKGROUND**

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

**A. The City's Rent Control Provision**

In 1994, Petaluma enacted the "Mobilehome Park Space Rent Stabilization Program." Petaluma, Cal. Municipal Code Ch. 6.50.010 ("the ordinance"). The year before the city council had retained a consultant to conduct a survey of mobilehome park residents. *Id.* Ch. 6.50.010(D). The ordinance adopted findings from the survey, including how nearly 80% of residents are at least 62 years old and rely on fixed incomes, roughly 90% are low income, and over half spend more than 30% of their income on housing. *Id.* Ch. 6.50.010(E). The council also found "there is a shortage of spaces for the locations of mobilehomes in the city, a condition which results in low vacancy rates and tends to prevent normal competition between the owners and tenants of mobilehome parks." *Id.* Ch. 6.50.010(M). The city council therefore recognized "a need to … provide protection to tenants from unreasonable rent increases" and "alleviat[e] the unequal bargaining power which exists between" residents and park owners, while simultaneously allowing "park owners to obtain a fair and reasonable rate of return and … to generate income" from rent. *Id.* Ch. 6.50.010(F), (X).

The ordinance's primary solution was to cap rent increases, *i.e.*, rent control. Unless an exception applies, a mobilehome park owner "shall not" increase a tenant's rent within one year of the most recent rent increase, and any rent increase "may not exceed" the lesser of 4%, or 70% of the percent change in the Consumer Price Index (CPI).[2] *Id.* Ch. 6.50.040(A). "If the change in the CPI is negative, no rent increase is permitted." *Id.* An owner may raise rent in excess of those limits by either (1) resetting the base rent price to market value pursuant to the "vacancy control" provision or (2) raising rents pursuant to owners' right to a "fair return."

**B. The 2025 Vacancy Control Amendment**

As relevant here, the primary rent-control exception is a so-called "vacancy control" provision. "A mobilehome park owner shall be permitted to charge a new base rent for a mobilehome space whenever a lawful space vacancy occurs." *Id.* Ch. 6.50.220(A). As originally

---

[2] The consumer price index measures inflation. "'Consumer price index' or 'CPI' means the consumer price index for all urban consumers, San Francisco-Oakland Area, published by the U.S. Department of Labor, Bureau of Labor Statistics." *Id.* Ch. 6.50.020(G).

United States District Court
Northern District of California

enacted, the ordinance defined a "lawful space vacancy" to include "the termination of the tenancy of the affected mobilehome tenant in accordance with […] California Civil Code Sections 798.55 through 798.60[.]" (Dkt. No. 16-2 at 33 (citing the version of Ch. 6.50.220(A)(1) effective August 13, 2025).) Those California Civil Code sections provide a tenancy can be terminated when a tenant is evicted for just cause or the mobilehome owner sells the home. *See generally* Cal. Civ. Code §§ 798.55-798.60. So, in either scenario, as originally enacted, the vacancy control provision allowed park owners to reset rent for a space to market value, *i.e.*, the price the owner would charge in the absence of rent control.

But in 2025 the City amended the definition of "lawful space vacancy." The vacancy control now reads, in relevant part:

> For purposes of this chapter, a lawful space vacancy is defined as follows:
>
> 1. A vacancy occurring because of the termination of the tenancy of the affected mobilehome tenant in accordance with the Mobilehome Residency Law **pursuant to Civil Code Section 798.56.** Notice given by a tenant to the manager or owner of a mobilehome park sixty days prior to vacating a tenancy pursuant to **Civil Code Section 798.59 does not create a lawful vacancy permitting the charging of a new base rent** pursuant to this section.

Petaluma, Cal. Municipal Code Ch. 6.50.220(A)(1) (emphasis added). Under the amended vacancy control provision, a park owner may reset rents to market value when a tenant is evicted for just cause, but may no longer do so when the mobilehome owner sells the home pursuant to Section 798.59. *Id.*; *see* Cal. Civ. Code §§ 798.56, 798.59.

### C. Park Owners' Right to a Fair Return

A park owner may also increase rent above the ordinance's limits to receive a "fair return" on their investments. *Id.* Ch. 6.50.040(E); Ch. 6.50.060. If the owner believes they are not getting a "fair return," the owner may file a petition with the City, which begins an arbitration process. *Id.* "Upon receipt" of the petition, the city "shall, within seven working days, assign an arbitrator" and "set a date for … hearing" between 14 and 60 days after the arbitrator is assigned. *Id.* Ch. 6.50.060(E).

During the arbitration, "park owners shall bear the burden to prove [… by] the

preponderance of the evidence the reasonable necessity of any rent increase" beyond the ordinance's caps "to earn a reasonable return." *Id.* Ch. 6.50.060(G)(1). There is a rebuttable presumption "the net operating income received by the owner" provides "a fair return." *Id.* Ch.60.050.100(A). In the arbitration, the parties "may present evidence regarding the presumption," *i.e.*, evidence about the park owner's "net operating income" and whether that amount is "fair." *Id.* Ch. 6.050.100(C). For instance, the parties may offer and cross-examine witnesses, experts, and documentary evidence about a park owner's "exceptional expenses" for "maintenance and repairs," whether the owner's "expenses were unreasonably high or low notwithstanding the application of prudent business practices," and any "uncollected rents … and bad debts" which are "beyond the control of the owner." *Id.* Ch. 6.50.060(G)(3); Ch. 6.50.100(B), (C). The arbitrator must submit a "written statement of decision" "within fourteen days of the hearing." *Id.* Ch. 6.50.060(G)(4).

### D.    Plaintiff's Allegations

"At a mobilehome park, the park owner owns the land on which mobilehomes are placed. In most cases, the […] residents own the mobilehome and rent the underlying […] space on which the home is placed." (Dkt. No. 18 ¶ 12.) A mobile home "is not installed on a permanent foundation. Though movable, when a homeowner decides to move out of a park, he typically will sell the home 'in-place' at the park to a new homeowner, who then becomes the lessor of the underlying space." (*Id.* ¶ 13.)

Plaintiff "is a limited liability company that owns" property in the "City of Petaluma, where it operates a mobilehome park." (*Id.* ¶ 4.) The "park has 69 spaces or pads, with mobilehomes on all of them. Each home is owned by the resident or residents that live there. Each homeowner rents or leases, from [Plaintiff], the space on which the home sits." (*Id.* ¶ 19.)

To contextualize its claims, Plaintiff alleges details about mobilehome markets. Like homes and cars, every "mobilehome has a fair market value." (*Id.* ¶ 17.) "The vast majority" of mobilehomes are "sold in-place in a park," and when those sales occur, "the mobilehome's market value is at least partly a function of the rent paid for the underlying space. All things being equal, the lower the rent, the higher the mobilehome's value." (*Id.* ¶ 18.) A rent control ordinance like

United States District Court
Northern District of California

Petaluma's "artificially suppresses the rent charged for a space," thereby raising mobilehome sale prices and benefiting mobilehome owners. (*Id.* ¶ 18.) Plaintiff alleges "almost 90% of a mobile home's sale price represents the value of the lower rents set by the rent-control law," and at its park, mobilehomes "with an inherent value of roughly $5,000 to $25,000[] are selling for roughly $150,000 to $225,000." (*Id.* ¶¶ 26, 44.) As alleged, this windfall to homeowners comes at the expense of park owners' rental income because "space rents are roughly 40% of their fair market value" "due to the City's onerous rent-control law." (*Id.* ¶ 25.)

Plaintiff challenges the 2025 vacancy control amendment, asserting it "undermines investment-backed expectations, as it was enacted *after* Capri acquired the park and flies in the face of the expectations of both Capri and residents that rents can be reset to market following a lawful vacancy." (*Id.* ¶ 45.) Now, as amended, the ordinance means "parks like Capri can now almost *never* reset space rents to market levels. For the vast majority of spaces, Capri will never be able to raise rents to market." (*Id.* ¶ 23.) Effectively, the ordinance

> compels a wealth transfer from park owners to a select group of "windfall residents" who held space-tenants at the time of the Ordinance's enactment. The transfer is of the Premium, defined as the net present value of the expected savings associated with the future legally constrained space rent obligations to the park. Specifically, the Ordinance requires a landowner to relinquish an ascertainable amount of money (the Premium) linked to a specific, identifiably property interest (the leasehold governing the leased space) and to transfer it to a third party (the mobilehome owner), which Premium the third party realizes upon the sale of his home. [… T]he Premium is defined and measured by what the owner would be willing to pay for the leasehold in a competitive, unregulated, and arms-length transaction.

(*Id.* ¶ 36.) So, the ordinance "benefits only those who were residents at the time of the [ordinance's] enactment and who then sell their homes for inflated prices." (*Id.* ¶ 28.)

Plaintiff brings two causes of action. First, Plaintiff contends the vacancy control amendment violates the Fifth Amendment's Takings Clause, which reads "… nor shall private property be taken for public use, without just compensation." U.S. Const. Amend. V. Plaintiff asserts the ordinance amendment is a *per se* taking and a regulatory taking, and is therefore unconstitutional because the taking is not for "public use" and/or the government does not provide "just compensation." Second, Plaintiff brings a substantive due process claim under the

5

Fourteenth Amendment. Both causes of action are brought under 42 U.S.C. section 1983, and Plaintiff purports to challenge the ordinance amendment on its face and as applied in each cause of action.

## DISCUSSION

Defendant moves to dismiss all of Plaintiff's claims. First, Plaintiff has not plausibly alleged the amendment is a *per se* taking or a regulatory taking , and the as-applied takings claim is not ripe.[3] Second, the Substantive Due Process claim fails because the ordinance survives rational basis review.

### I. Plaintiff's Facial Takings Challenge

As relevant here, there are two types of takings. The first is a *per se* taking, often referred to as a "physical" or "categorical" taking, when "the government acquires private property for a public purpose, whether the acquisition is the result of a condemnation proceeding or a physical appropriation." *Brown v Legal Found. of Wash.*, 538 U.S. 216, 233 (2003) (cleaned up). The second type is a "regulatory taking," which requires "essentially ad hoc, factual inquiries." *Id.* at 234 (cleaned up). *Brown* summarizes case law illustrating the difference between *per se* and regulatory takings:

> When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof. Thus, compensation is mandated when a leasehold is taken and the government occupies the property for its own purposes, even though that use is temporary. Similarly, when the government appropriates part of a rooftop in order to provide cable TV access for apartment tenants, or when its planes use private airspace to approach a government airport, it is required to pay for that share no matter how small. But a government regulation that merely prohibits landlords from evicting tenants unwilling to pay a higher rent, that bans certain private uses of a portion of an owner's property, or that forbids the private use of certain airspace, does not constitute a categorical taking. The first category of cases requires courts to apply a clear rule;

---

[3] Under the Fifth Amendment, the government may not take private property for "public use" and without "just compensation." U.S. Const. Amend. V. The parties dispute whether Plaintiff has plausibly alleged a "private taking," *i.e.*, whether Plaintiff has alleged the government has committed a taking for "public use. (Dkt. No. 18 at 10-11; Dkt. No. 11 at 11-12.) Because Plaintiff has not alleged facts sufficient to support an inference a taking occurred, the Court need not address whether the ordinance was for public vs. private use.

the second necessarily entails complex factual assessments of the purposes and economic effects of government actions.

*Id.* at 233-34 (internal citations and quotation marks omitted).

As explained below, drawing inferences in Plaintiff's favor, Plaintiff has not alleged facts plausibly supporting an inference the ordinance is either a *per se* taking or a regulatory taking.

**A.  Per Se Taking**

To argue the vacancy control amendment is a *per se* taking, Plaintiff relies on two cases. Both are inapposite.  First, *Cedar Point Nursey v. Hassid*, 594 U.S. 139 (2021) held it constitutes a "*per se* physical taking" for a California law to require certain employers to allow union organizers onto the employer's premises because the law is a "government-authorized invasion[] of property … allowing union organizers to traverse [the property] at will."  *Id.* at 141, 149, 152. Plaintiff does not assert the ordinance causes a physical invasion of their property, which is the only *per se* taking theory *Cedar Point* addresses.  (*See generally* Dkt. Nos. 18, 25.)  Plaintiff says *Cedar Point* stands "for the uncontroversial proposition … that a taking can occur even if 'the property at issue does not first pass through the government's hands.'" (Dkt. No. 25 at 10 (quoting Dkt. No. 18 ¶ 10).)  True, a *per se* taking does not require the government to own the property, but that portion of *Cedar Point* cannot reasonably be interpreted to apply to anything but a physical-invasion-of-property taking theory.  So, *Cedar Point* is unhelpful to Plaintiff.

Second, in *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013), the plaintiff sought to obtain a land-use permit to undertake construction on his property.  *Id.* at 600.  The local agency with jurisdiction over the plaintiff's land had a regulation requiring "permit applicants wishing to build on wetlands offset the resulting environmental damage by creating, enhancing, or preserving wetlands elsewhere."  *Id.* at 600–01.  Consistent with that regulation, when the plaintiff applied for a permit, the agency conditioned its approval on the plaintiff agreeing to one of two things.  First, the plaintiff could "reduce the size of his development" and "deed to the [agency] a conservation easement" on his property.  *Id.* at 601–02.  Alternatively, the plaintiff could "proceed with the development as proposed" and "hire contractors make improvements to" agency-owned land not on the plaintiff's property.  *Id.* at 602.  The Supreme Court held the government's conditions constituted a *per se* taking by "directing someone to spend money," *i.e.*, "the

United States District Court
Northern District of California

7

government command[ed] the relinquishment of funds linked to a specific, identifiable property interest such as a bank account or parcel of property." *Id.* at 614. In other words, both conditions "would transfer an interest in property from the landowner to the government." *Id.* at 615.

Citing *Koontz*, Plaintiff asserts the vacancy control amendment is a *per se* taking because it "compels a wealth transfer from park owners" to residents who lived in mobile parks "at the time of the [amendment]'s enactment." (Dkt. No. 18 ¶ 36.) As the argument goes, the "wealth" purportedly being "transfer[red]" is a "Premium, defined as the net present value of the expected savings associated with the future legally constrained space rent obligations to the park." (*Id.*) Simply put, Plaintiff alleges a reduction in "expected," "future" rent earnings because, absent the ordinance, park owners would charge higher rents. (*See id.*)

Drawing inferences in Plaintiff's favor, Plaintiff does not allege facts sufficient to support an inference the vacancy control amendment "transfer[s] an interest in property from the landowner to the government," thereby making the ordinance a *per se* taking. *Koontz*, 570 U.S. at 616. Plaintiff does not allege the amendment requires "the relinquishment of funds" in a "bank account," nor do those funds go "to the government." *Id.* at 615–16. Rather, Plaintiff alleges the ordinance reduces their "future," "expected" earnings from rent, which comes from tenants. (Dkt. No. 18 ¶ 36.) Plaintiff's allegations of a "wealth transfer" are thus conclusory; "wealth" does not include the "present value" of future, unearned, un-promised money to which Plaintiff is not entitled. (*Id.*)

Further, Plaintiff's argument is foreclosed by *Yee v. Escondido, Cal.*, 503 U.S. 519 (1992) and Ninth Circuit caselaw interpreting *Yee*. There, the Supreme Court rejected the theory a rent control ordinance similar to Petaluma's essentially caused a "physical occupation of the park owner's land" because the ordinance "transferred … the right to occupy the land indefinitely at a submarket rate[ ] from the park owner to the mobile home owner." 503 U.S. at 527. Although *Yee*'s holding was limited to the argument the ordinance constituted a physical invasion of land, the Court's reasoning strongly suggested an ordinance like Petaluma's must be analyzed as a regulatory taking:

On their face, the state and local laws at issue here merely regulate

8

petitioners' use of their land by regulating the relationship between landlord and tenant. This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails. When a landowner decides to rent his land to tenants, the government may place ceilings on the rents the landowner can charge, or require the landowner to accept tenants he does not like, without automatically having to pay compensation. Such forms of regulation are analyzed by engaging in the "essentially ad hoc, factual inquiries" necessary to determine whether a regulatory taking has occurred. In the words of Justice Holmes, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."

*Yee*, 503 U.S. at 528–29 (internal citations and quotation marks omitted). Indeed, the Ninth Circuit held, en banc, "*Yee v. City of Escondido* holds that a takings challenge to mobile home rent control ordinances similar to [Defendant's] should be analyzed as a regulatory taking[, …] not a physical occupation amount to a per se taking[.]" *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010) (en banc). In *Guggenheim*, the plaintiffs there, mobilehome park owners, raised a virtually identical theory to Plaintiffs' challenge here: "by locking in a rent below market rents, and allowing tenants to sell their mobile homes to buyers who still enjoy the benefits of the controlled rent[, …] the ordinance shifts much of the value of ownership of the land […] to the tenant." *Id.* at 1115. And interpreting *Yee*, the Ninth Circuit held that ordinance is not a *per se* taking. *Id.* at 1120. So, Plaintiff's *per se* challenge fails.

At the hearing, Plaintiff urged *Koontz*, rather than *Yee* and *Guggenheim*, is controlling. Plaintiff asserts *Yee* and *Guggenheim* only addressed "physical" *per se* theories, whereas *Koontz* is a new type of *per se* claim. Not so. This Court is bound by *Yee* and *Guggenheim* unless "the reasoning or theory" in those cases "is clearly irreconcilable with the reasoning or theory" of *Koontz*. *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003). *Koontz* did not involve a rent control ordinance; it explicitly applies to government conduct "when owners apply for land-use permits." 570 U.S. at 604. So, *Koontz* is not "clearly irreconcilable" with *Yee* or *Guggenheim*. And even if *Koontz* broadly applied to any situation where the government "direct[s] someone to spend money," *id.* at 614, as explained above, Plaintiff has not alleged facts sufficient to support an inference the government has forced Plaintiff to *spend* money because, drawing inferences in Plaintiff's favor, Plaintiff alleges it *receives* less money in rent.

United States District Court
Northern District of California

Plaintiff's reliance on *Levin v. City & County of San Francisco*, 71 F. Supp. 3d 1072 (N.D. Cal. 2014) is also misplaced.  There, the court found an ordinance requiring landlords to pay a lump-sum payment to tenants effected a *per se* taking.  *See id.* at 1077-86.  But drawing inferences in Plaintiff's favor, Petaluma's ordinance does not require Plaintiff to pay or relinquish money.  Despite Plaintiff's attempts to define their losses in terms of "Premiums," the bottom line is Plaintiff merely alleges a reduction in future rental income.[4]  To the extent that constitutes a taking, the Supreme Court has "consistently affirmed" it is not a *per se* taking.  *Yee*, 503 U.S. at 528-29; *see id.* ("When a landowner decides to rent his land to tenants, the government may place ceilings on the rents the landowner can charge[.]"); *FCC v. Florida Power Corp.*, 480 U.S. 245, 252 (1987)  ("statutes regulating the economic relations of landlords and tenants are not *per se* takings"); *Guggenheim*, 638 F.3d at 1115 (holding is it not a *per se* taking for a mobile home rent control ordinance to "lock[] in a rent below market rents" and therefore "shift[] much of the value of ownership of the land … to the tenant.")

So, the Court grants Defendant's motion as to Plaintiff's *per se* takings claim.

### B.  Regulatory Taking

An ordinance is a regulatory taking when it is "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005).  "[A] takings challenge to [a] mobile home rent control ordinance … should be analyzed as a regulatory taking under *Penn Central* [*Transportation Co. v. New York City*, 438 U.S. 104 (1977)]."  *Guggeinheim*, 638 F.3d at 1120.

Courts apply three *Penn Central* factors to determine whether government conduct is a regulatory taking.  First, "'[p]rimary among those factors are the economic impact of the

---

[4] A district court recently dismissed an as-applied challenge to Petaluma's ordinance brought by Plaintiff's counsel, noting the plaintiffs there were "careful" in how they framed their economic injuries.  *See Little Woods Mobile Villa LLC v. City of Petaluma*, 736 F. Supp. 3d 757, 761 (N.D. Cal. 2024) ("Plaintiffs allege that it is economically infeasible to continue operating their parks because the City's rent-control ordinance prevents Plaintiffs from raising rents[. …] Plaintiffs say[] they are being forced to operate their parks at an 'economic loss.'"); *id.* at 763 n.1 ("The best reading of the complaint seems to be that Plaintiffs are currently making some profit; they are careful to say they are forced to operate at an 'economic loss' rather than simply a 'loss.'")

10

regulation on the claimant[.]" *Guggeinheim*, 638 F.3d at 1120 (quoting *Lingle*, 544 U.S. at 538–39). The second factor, which overlaps with the first, is "'the extent to which the regulation has interfered with distinct investment-backed expectations.'" *Guggeinheim*, 638 F.3d at 1120 (quoting *Lingle*, 544 U.S. at 538–39). Third, courts consider "the 'character of the governmental action'–for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.'" *Lingle*, 544 U.S. at 539 (quoting *Penn Central*, 438 U.S. at 124).

Plaintiff asserts the vacancy control amendment is a regulatory taking under the *Penn Central* factors. First, the law has a "severe" economic impact on Plaintiff because "almost 90% of a mobile home's sale price represents the value of the lower rents set by the rent-control law, and this Premium goes into the pockets of the … residents[] who happened to live at the park at the time of the Ordinance's enactment." (Dkt. No. 18 ¶ 44.) Second, the vacancy control amendment "undermines investment-backed expectations, as it was enacted *after* [Plaintiff] acquired the park and flies in the face of the expectations of both [Plaintiff] and residents that rents can be reset to market following a lawful vacancy." (*Id.* ¶ 45.) Third, Plaintiff emphasizes the vacancy control amendment regulates some actors, but not others: the ordinance "restricts only the amount the landowner can charge a new resident for rental" and "does not limit the amount which the outgoing resident, in turn, can demand for sale of his mobile home to that new resident, who must pay an artificially high price to buy the mobile home." (*Id.* ¶ 46.) Notably, Plaintiff does not cite any authority holding a rent control ordinance constitutes a regulatory taking.

To the contrary, the Ninth Circuit has held, on nearly identical facts, a mobilehome rent control ordinance did not constitute a regulatory taking. *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118 (9th Cir. 2013), addressed a mobilehome rent control ordinance enacted in 1989 which, like Petaluma's ordinance, tied permissible rent increases to inflation. *Id.* at 1122. In 1993, the ordinance was amended "to add 'vacancy control,' which gave any new resident taking over a mobilehome pad lease the right to rent the pad at the same rate as the previous tenant." *Id.* at 1122. Then, in 1999, the government amended the ordinance again to adjust the permissible rent increases. *Id.* at 1122–23. The plaintiff park owner purchased the park in between the 1993

11

and 1999 amendments' adoptions. *See id.* at 1122–23, 1127.[5]  In the lawsuit, the plaintiff challenged the "the entire Ordinance as it existed in 1999," including the 1993 vacancy control amendment.[6]  *See id.* at 1122–23, 25.

Applying the *Penn Central* factors, *MHC* held the ordinance did not constitute a regulatory taking.  First, under the "economic impact" factor, the district court found the rent control ordinance caused an "81% diminution in value" of the park "by comparing the effect of the 1999 Ordinance with the hypothetical economic result assuming that there was no rent control ordinance in effect at all."  *MHC*, 714 F.3d at 1127.  The *MHC* court held that analysis was an error in two ways.  First,

> that analysis assumes that MHC purchased the property prior to the enactment of the original ordinance, when it did not. The ordinance was in effect when MHC acquired the property. Therefore, the appropriate analysis of the economic impact on MHC is a comparison of the economic impact of the 1993 Ordinance in effect when MHC purchased the mobilehome park, and the economic effect of the 1999 Ordinance enacted after the property acquisition. *See* [*Lingle*, 544 U.S. at 538–39] (focusing on the "economic impact of the regulation").

*MHC*, 714 F.3d at 1127.  Second, even assuming that 81% diminution in value was correct, that reduction was not "sufficient economic loss or interference with [the park owner's] reasonable investment-backed expectations to constitute a taking.  Supreme Court precedent has long established that mere diminution in the value of property, however serious, is insufficient to demonstrate a taking."  *Id.* at 1127–28 (citing three Supreme Court cases finding no taking when the regulations, respectively, caused an "approximately 75% diminution in value," a "92.5% diminution," and a 90% diminution).

---

[5] The opinion does not provide the exact date or year on which the plaintiff purchased the park. But *MHC* makes clear the plaintiff purchased the park "[w]hile" a prior state court suit challenging the 1993 ordinance amendment was "on appeal," and cites the state court decision upholding the ordinance: "*De Anza Assets, Inc. v. City of San Rafael,* Case No. A063017 (Cal.Dist.Ct.App. Oct. 6, 1994)."  *See MHC*, 714 F.3d at 1122–23.  Later, *MHC* notes the plaintiff "did not" "purchase[] the property prior to the enactment of the original ordinance" in 1989 and "[t]he ordinance was in effect when [the plaintiff] acquired the property."  *Id.* at 1127.

[6] The Ninth Circuit ruled the plaintiffs could raise arguments regarding the 1993 vacancy control amendment, despite a one-year statute of limitations, "because the constitutionality of the Ordinance can only be determined by evaluating the totality of its provisions and effects and because the 1999 amendments cannot be evaluated in isolation."  *Id.* at 1125.

United States District Court
Northern District of California

Second, under the "investment-backed expectations" factor, the plaintiff urged it had the expectation it would be able to 'increase rent at a rate consistent with the rate of increase in housing costs … that is, [the] expectation was that [the park] would be subject to no rent control at all." *Id.* at 1128 (cleaned up). The district court below agreed, finding the park owner "had no reason to expect that the City would amend the Ordinance, transferring much of the park's value to third parties[.]" *Id.* (cleaned up). The Ninth Circuit ruled that holding was an error:

> "'[T]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.' " *Concrete Pipe* [*& Prods. Of Cal., Inc v. Constr. Laborers Pension Trust for S. Cal.*,], 508 U.S. [602,] 645 [(1993)]

> Indeed, sitting en banc in *Guggenheim*[ …], we recently held that the "'primary factor,' 'the extent to which the regulation has interfered with distinct investment-backed expectations'" to be "fatal" to the Guggenheims' takings claim, where the Guggenheims purchased a mobilehome park with a rent control ordinance already in place. 638 F.3d at 1120. "[T]he price they paid for the mobile home park doubtless reflected the burden of rent control they would have to suffer. They could have no 'distinct investment-backed expectations' that they would obtain illegal amounts of rent." *Id.* Therefore, this factor also favors the conclusion that no taking occurred.

*MHC*, 714 F.3d at 1128. Finally, evaluating the "character of the ordinance," *MHC* held the ordinance was "much more an 'adjustment of the benefits and burdens of economic life to promote the common good' than it is a physical invasion of property, and [the amendments] only a slight modification to an already-existing rent control ordinance[.]" *Id.* (quoting *Penn Central*, 438 U.S. at 124).

In light of *MHC*, and drawing all inferences in Plaintiff's favor, Plaintiff does not allege facts plausibly supporting an inference the vacancy control amendment is a *Penn Central* regulatory taking. First, Plaintiff emphasizes Petaluma's ordinance effectively transfers 90% of the value of home sale prices to people who were tenants at the time of the ordinance's enactment. That is insufficient under *Penn Central*'s first factor because the factor inquires about the severity of impact, and Plaintiff does not quantify the ordinance's economic impact *on Plaintiff*; instead, Plaintiff attempts to quantify the ordinance's impact on mobilehome sale prices. So, Plaintiff has not alleged facts showing how much the vacancy control amendment impacts *Plaintiff*. Plaintiff's

failure to quantify an economic impact means it has not alleged facts sufficient to support an inference the economic impact is so severe the ordinance is functionally equivalent to a classic taking.[7] *See MHC*, 714 F.3d at 1127–28 (citing Supreme Court cases finding a 90% reduction in property values was an insufficient economic impact on the plaintiffs).

Second, drawing inferences in Plaintiff's favor, Plaintiff has not alleged facts supporting an inference the vacancy control amendment interfered with its reasonable investment-backed expectations. Petaluma enacted the ordinance in 1994, then enacted the challenged amendment in 2025. Plaintiff alleges it purchased the park before the 2025 amendment's enactment and, at the hearing, clarified its purchase occurred after the original ordinance's enactment. Hence, Plaintiff contends "it had no reasonable investment-backed expectations that" the 2025 ordinance amendment "would be adopted." (*See* Dkt. No. 25 at 11.) But because rent control was in effect when Plaintiff purchased the park, or, at least, Plaintiff does not allege that it was not, Plaintiff's argument is foreclosed by binding Ninth Circuit precedent. In *Guggenheim*, the ordinance passed in 1987, and the park owners purchased the park in 1997. 638 F.3d at 1115. The park owners, like Plaintiff here, asserted the ordinance "transfer[red] … rent … from the landlord to the tenant, and that this had the effect of raising the price of the average mobile home." *Id.* at 1120. The court assumed that impact happened, and noted the ordinance caused that impact

> before the [owners] bought the mobile home park. Since the ordinance was a matter of public record, the price they paid for the mobile home park doubtless reflected the burden of rent control they

---

[7] Plaintiff also alleges "due to the City's onerous rent-control law, Capri's space rents are roughly 40% of their fair market value." (Dkt. No. 18 ¶ 25.) But Plaintiff does not mention this allegation in the "regulatory taking theory" section of its opposition brief. (Dkt. No. 25 at 10-11) (cleaned up). To the extent this allegation quantifies the economic impacts on Plaintiff, the allegation is insufficient because Plaintiff specifically challenges the 2025 vacancy control amendment. Therefore, "the appropriate analysis of the economic impact on [Plaintiff] is a comparison of the economic impact of the […] Ordinance in effect when [Plaintiff] purchased the mobilehome park, and the economic effect of the [amendment] enacted after the property acquisition" in 2025. *See MHC*, 714 F.3d at 1127. Plaintiff does not allege when it acquired the park and does not quantify losses since the amendment's enactment. Plaintiff also expressly alleges space rents are so low compared to market value "due to the City's onerous rent-control law," not due to the 2025 vacancy control amendment, so Plaintiff has not conducted the "appropriate analysis." *See id.*; (Dkt. No. 18 ¶ 25.) Because Plaintiff has not quantified the economic effect of the 2025 vacancy control amendment, as opposed to the ordinance as a whole, drawing inferences in Plaintiff's favor, Plaintiff has not alleged facts sufficient to support an inference the vacancy control amendment has such a severe economic impact that it is functionally equivalent to a classic taking.

14

> would have to suffer. They could have no 'distinct investment-backed expectations' that they would obtain illegal amounts of rent. […] The [owners] bought a trailer park burdened by rent control, and had no concrete reason to believe that they would get something much more valuable, because of hoped-for legal changes, than what they had.

*Id.* at 1120-1121.  Similarly, in *MHC*, the original "ordinance was in effect when [the plaintiff] acquired the property," but the plaintiff challenged an amendment enacted *after* it purchased the property.  *MHC*, 714 F.3d at 1127–28.  Relying on *Guggenheim*, *MHC* ruled it was erroneous for the district court to conclude the park owner "had no reason to expect that the City would amend the Ordinance, transferring much of the park's value to third parties" because "'those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.'"  *Id.* (quoting *Concrete Pipe*, 508 U.S. at 645).  For that reason, *MHC* squarely forecloses Plaintiff's argument it had a reasonable investment-backed expectation the 2025 ordinance amendment would not be adopted.  Plaintiff concedes it purchased the park while Petaluma's rent control ordinance was in effect–that is, Plaintiff began "do[ing] business" in a "regulated field," and therefore "cannot object" to Petaluma's "subsequent amendments to achieve the [ordinance's] legislative end."  *Id.*

Finally, Plaintiff cites no authority for its argument a rent control ordinance's character is akin to a classic taking, except to say "regulatory takings cases necessarily entail complex factual assessments of the purposes and economic effects of government actions" and "[a] motion to dismiss is not an appropriate mechanism for resolving factual disputes."  (Dkt. No. 25 at 11.) (cleaned up).  Drawing inferences in Plaintiff's favor, Plaintiff's allegations do not plausibly support an inference the ordinance's purposes or effects make the law functionally equivalent to a classic taking.  The ordinance's plain text demonstrates, among other things, its purpose is to limit rent increases for mobile home park tenants, who are primarily low-income or elderly and who have limited bargaining power over park owners in negotiating rent increases.  *See generally* Petaluma Cal. Municipal Code Ch. 6.50.010.  And the Supreme Court and Ninth Circuit have made clear, without reference to specific facts, a rent control ordinance's effects are not equivalent to a physical or *per se* taking.  *See Yee*, 503 U.S. at 528–29 ("This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant

*United States District Court*
*Northern District of California*

relationship in particular without paying compensation for all economic injuries that such regulation entails.") (cleaned up); *id.* at 528 ("Put bluntly, no government has required any physical invasion of petitioners' property. Petitioners' tenants were invited by petitioners, not forced upon them by the government. […] [A] typical rent control statute will transfer wealth from the landlord to the incumbent tenant and all future tenants. […] This effect […] has nothing to do with whether the ordinance causes a *physical* taking."); *MHC*, 714 F.3d at 1127-28 (noting the *Penn Central* inquiry is about how "the interference with property can be characterized" and ruling, without reference to specific facts, "the Ordinance is much more an adjustment of the benefits and burdens of economic life to promote the common good than it is a physical invasion of property") (cleaned up)).

So, the Court grants Defendant's motion as to Plaintiff's regulatory-takings claim because drawing all inferences in Plaintiff's favor, Plaintiff has not alleged facts supporting an inference the ordinance is a regulatory taking.

### C.  Plaintiff's As-Applied Takings Challenge is Not Ripe

Defendant argues Plaintiff's as-applied takings challenge is not ripe because Plaintiff has not alleged it petitioned for a rent increase.  The Court agrees.  "[A] regulatory takings claim is not ripe until the appropriate administrative agency has made a final decision on how the regulation will be applied to the property at issue." *Guggenheim*, 638 F.3d at 1117.  To satisfy the requirement, "all a plaintiff must show is that there is no question … about how the regulations at issue apply to the particular land in question." *Pakdel v. City & Cnty. of San Francisco*, 594 U.S. 474, 478 (2021).  The ripeness requirement is "prudential," not jurisdictional. *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 733-34 (1997).

Drawing inferences in Plaintiff's favor, Plaintiff has not alleged facts supporting an inference its as-applied challenge is ripe because Plaintiff has not alleged whether it petitioned the City to increase rent above the ordinance's annual limits.  As explained above, the "primary" factor in Plaintiff's as-applied regulatory takings claim is the economic impact on Plaintiff. *Guggenheim*, 638 F.3d at 1120 (cleaned up).  Yet Plaintiff does not specify how much income it has lost, or will lose, due to the vacancy control amendment.  Instead, Plaintiff's allegations of an

United States District Court
Northern District of California

United States District Court
Northern District of California

economic impact are based on generalized findings from "[s]ome studies," an allegation rent values are 40% of fair market value due to the entire ordinance, and one example of "a mobilehome for sale at the park" for which Plaintiff "expects" a vacancy "to occur at the park in the next several months." (*See* Dkt. No. 18 ¶¶ 20, 25-27.)  While these allegations suggest the vacancy control amendment has at least some economic impact, the ordinance provides a potential remedy to offsets those harms: Plaintiff can petition the City for an arbitration hearing, offer evidence its rental income is not providing it a "fair return," and subsequently earn the right to charge rents in excess of the ordinance's limits.  *See generally* Petaluma, Cal. Municipal Code Ch. 6.50.040, 6.50.060.  Because Plaintiff has not availed itself of a potential remedy which could reduce the amendment's economic impact, the Court cannot ascertain how "the regulations at issue apply to the particular land in question," namely the degree to which the vacancy control amendment impacts Plaintiff.  *See Pakdel*, 594 U.S. at 478; *MHC*, 714 F.3d at 1127 ("[T]he constitutionality of the Ordinance can only be determined by evaluating the totality of its provisions and effects and because […] amendments cannot be evaluated in isolation.")

So, the Court grants Defendant's motion to dismiss as to Plaintiff's as-applied takings claims.

## II.    Substantive Due Process

Plaintiff's substantive due process claim hinges on whether the ordinance is "rationally related to a legitimate governmental purpose.  We will strike down a statute on substantive due process grounds if it is arbitrary and irrational."  *MHC*, 714 F.3d at 1130 (cleaned up).  "[T]he threshold for a rationality review challenge asks only whether the enacting body could have rationally believed at the time of enactment that the law would promote its objective."  *Id.* at 1130–31 (citing *Equity Lifestyle Props., Inc. v. Cnty. of San Luis Obispo*, 548 F.3d 1184, 1194 (9th Cir. 2008)).

Plaintiff argues the vacancy control amendment has neither a legitimate governmental purpose nor a rational connection to such a purpose.  First, Plaintiff construes the City's interest as "enriching a select few" residents "at the expense of park owners" and of "incoming residents who pay inflated prices for their homes." (Dkt. No. 25 at 14.)  Second, "even if housing affordability

17

were the government interest at issue," the amendment "bears no rational relationship to the promotion of housing affordability" because the amendment "transfers a premium from park owner to existing residents," which increases mobilehome prices.  (Dkt. No. 25 at 14-15.)

Drawing inferences in Plaintiff's favor, Plaintiff has not alleged facts supporting an inference the vacancy control amendment lacks a rational connection to a legitimate government interest.  A rent-control ordinance has a legitimate government interest "if it is designed to accomplish an objective within the government's police power." *Equity Lifestyle*, 548 F.3d at 1194 (cleaned up).  The ordinance is "designed" to accomplish purposes within the government's police power because it expressly identifies the City's interests in promoting affordable housing, reducing homelessness, protecting existing mobilehome tenants from "unreasonable […] rent increases," and many more.[8]  *See Equity Lifestyle*, 548 F.3d at 1194.  And the Supreme Court and Ninth Circuit have held highly similar interests are legitimate, and well within the government's police power.  *See Pennell v. City of San Jose*, 485 U.S. 1, 13 (1988) ("[W]e have long recognized that a legitimate and rational goal of price or rate regulation is the protection of consumer welfare"); *Equity Lifestyle*, 548 F.3d at 1194 (relying on *Pennell* to find a "legitimate public purpose" when a rent control ordinance "includes a paragraph describing its purpose, which is to 'protect the owners and occupiers of mobilehomes from unreasonable rent increases[.]'").  Therefore, Plaintiff's allegations, which do not mention the ordinance's expressly stated purposes, do not permit an inference the City does not share those interests,[9] or an inference those interests

---

[8]  *See, e.g.*, Petaluma, Cal. Municipal Code Ch. 6.50.010(E) (outlining survey results showing mobilehome park residents tend to be elderly and low-income); Ch. 6.50.010(L) ("The city of Petaluma is committed to assisting in the preservation of decent, safe and sanitary housing affordable to all economic segments of the community, especially mobilehome lots affordable to low and very low income individuals and families."); Ch. 6.50.010(M) ("there is a shortage of spaces … a condition which … tends to prevent normal competition between the owners and tenants of mobilehome parks); Ch. 6.50.010(T) (noting residents "have expressed the concern that they could become homeless" due to "significant rent increases"); Ch. 6.50.010(X)(1)-(2) (identifying two of the ordinance's purposes as "[p]reventing the imposition of exploitive, excessive and unreasonable mobilehome space rent increases[]" and "[a]lleviating the unequal bargaining power which exists between mobilehome park residents and mobilehome park owners.")

[9] Plaintiff characterizes the City's interest as "enriching a select few" residents "at the expense of park owners" and of "incoming residents" and rejects the notion the City has an interest in affordable housing.  (Dkt. No. 25 at 14-15.)  But for substantive due process claims, courts reject attempts by plaintiffs to define the government's interest, and instead rely on a law's text and what

are not legitimate.

Second, drawing inferences in Plaintiff's favor, Plaintiff has not alleged facts supporting an inference the vacancy control amendment lacks a rational connection to the City's asserted interests. Again, the test is "whether the enacting body could have rationally believed at the time of enactment the law would promote its objective." *Id.* Here, the City of Petaluma "could have rationally believed" the vacancy control amendment promotes affordable housing and reduces homelessness because it eliminates scenarios in which park owners could significantly raise rents on low-income and middle-income residents. *Id.*; *see* Petaluma, Cal. Municipal Code Ch. 6.50.010(E) (finding mobilehome park residents tend to be elderly and low-income); *id.* Ch. 6.50.010(S) ("mobilehome owners generally have very limited economic bargaining power concerning rents charged for mobilehome lots."); Ch. 6.50.010(T) (echoing residents' concerns "they could become homeless" due to "significant rent increases"). Plaintiff's allegations do not support an inference otherwise because whether the vacancy control amendment actually "will serve the purposes stated in the ordinance … is not for [courts] to decide." *Guggenheim*, 638 F.3d at 1123. Plaintiffs may be correct the amendment "causes the prices of homes to artificially and substantially increase." (Dkt. No. 25 at 15.) But because the City of Petaluma "could have rationally believed otherwise," the amendment does not violate substantive due process. *Equity Lifestyle*, 548 F.3d at 1194; *see Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 690 (9th Cir. 1993) ("It may be true that in operation the ordinance does nothing more than take money from the landlord and put it into the pocket of a tenant who no longer resides at the park. However, while one might believe that the ordinance is an ineffective—and indeed draconian—means by which to effect its goals, how well the ordinance serves its purposes is a legislative question, one

---

"the enacting body *could have* rationally believed at the time of enactment." *See Equity Lifestyle*, 548 F.3d at 1193–94 (emphasis added). For example, in *Equity Lifestyle*, the plaintiff argued a rent control ordinance "sole purpose" was to "transfer[] the value of [the park owner's] property to a select private group of tenants." *Id.* at 1193. The Ninth Circuit noted "[t]his argument challenges the foundation of the rent control law and would, if accepted, require its invalidation," then identified the government's purpose by referencing the ordinance's text. *See id.* at 1193–94. Therefore, to identify the relevant government purpose here, the Court refers to the ordinance's text, rather than Plaintiff's characterization.

the court will not consider in the context of a substantive due process challenge.") (cleaned up); *Guggenheim*, 638 F.3d at 1123 ("[T]he Due Process Clause does not empower courts to impose sound economic principles on political bodies.")

Accordingly, the Court grants Defendant's motion and dismisses Plaintiff's substantive due process claim.

### III.   Leave to Amend

Dismissal is without leave to amend for Plaintiff's *per se* takings claim and substantive due process claim because amendment would be futile. *Guggenheim* and *Yee* make clear challenges to mobilehome rent control ordinances are not *per se* takings, and the ordinance cannot be reasonably interpreted to authorize a physical invasion of Plaintiff's property. So, Plaintiff is unable to allege facts supporting a *per se* takings claim challenging Petaluma's vacancy control amendment. Plaintiff also cannot cure the defects in its substantive due process claim because such claims do not hinge on specific allegations; rather, they hinge on the statute, binding precedent, and what purposes legislators could reasonably believe. However, the Court grants Plaintiff leave to amend its regulatory-takings claim because Plaintiff may be able to articulate sufficient economic impacts under *Penn Central*'s first factor and/or a cognizable investment-backed expectations under *Penn Central*'s second factor. Finally, the Court's dismissal of Plaintiff's as-applied challenge as unripe is without leave to amend, but also without prejudice since it is a jurisdictional dismissal. *See Wolfson v. Brammer*, 616 F.3d 1045, 1064 (9th Cir. 2010).

### CONCLUSION

As explained above, the Court grants Defendant's motion and dismisses Plaintiff's claims. Drawing inferences in Plaintiff's favor, Plaintiff has not alleged facts sufficient to support an inference its as-applied takings challenge is ripe or an inference Petaluma's rent control ordinance is a *per se* taking, a regulatory taking, or a violation of Plaintiff's substantive due process rights. Dismissal is without leave to amend, except for Plaintiff's regulatory-taking claim. Plaintiff's amended complaint, if any, shall be due June 30, 2026. If Plaintiff does not file an amended complaint by that date, judgment will be entered.

This Order disposes of Docket No. 18.

20

**IT IS SO ORDERED.**

Dated: May 21, 2026

_____
JACQUELINE SCOTT CORLEY
United States District Judge