United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CAPRI MOBILE VILLA LLC,
Plaintiff,
v.
CITY OF PETALUMA,
Defendant.

Case No. 25-cv-09096-JSC

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

Re: Dkt. No. 35

Plaintiff Capri Mobile Village LLC, a mobilehome park owner in Petaluma, California, alleges Petaluma's mobilehome rent-control ordinance violates the Fifth Amendment's Takings Clause. (Dkt. No. 34.)[1] Plaintiff's Second Amended Complaint's ("SAC") sole cause of action alleges Petaluma's ordinance is an impermissible regulatory taking under *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1977). Defendant moves to dismiss Plaintiff's SAC. (Dkt. No. 35.) Having carefully considered the parties' arguments, and having held oral argument on the motion to dismiss the First Amended Complaint, the Court concludes oral argument is not required, *see* N.D. Cal. Civ. L.R. 7-1(b), VACATES the August 20, 2026 hearing, and GRANTS Defendant's motion for the reasons set forth below. Drawing inferences in Plaintiff's favor, Plaintiff has not alleged facts sufficient to support an inference Plaintiff's as-applied takings challenge is ripe or an inference Petaluma's ordinance constitutes a *Penn Central* regulatory taking.

//

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

## BACKGROUND

### A. The City's Rent Control Ordinance

In 1994, Petaluma enacted the "Mobilehome Park Space Rent Stabilization Program." Petaluma, Cal. Municipal Code Ch. 6.50.010 ("the ordinance"). The year before the city council had retained a consultant to conduct a survey of mobilehome park residents. *Id.* Ch. 6.50.010(D). The ordinance adopted findings from the survey, including how nearly 80% of residents are at least 62 years old and rely on fixed incomes, roughly 90% are low income, and over half spend more than 30% of their income on housing. *Id.* Ch. 6.50.010(E). The council also found "there is a shortage of spaces for the locations of mobilehomes in the city, a condition which results in low vacancy rates and tends to prevent normal competition between the owners and tenants of mobilehome parks." *Id.* Ch. 6.50.010(M). The city council therefore recognized "a need to … provide protection to tenants from unreasonable rent increases" and "alleviat[e] the unequal bargaining power which exists between" residents and park owners, while simultaneously allowing "park owners to obtain a fair and reasonable rate of return and … to generate income" from rent. *Id.* Ch. 6.50.010(F), (X).

The ordinance's primary solution was to cap rent increases, *i.e.*, rent control. Unless an exception applies, a mobilehome park owner "shall not" increase a tenant's rent within one year of the most recent rent increase, and any rent increase "may not exceed" the lesser of 4%, or 70% of the percent change in the Consumer Price Index ("CPI"). *Id.* Ch. 6.50.040(A). "If the change in the CPI is negative, no rent increase is permitted." *Id.* An owner may raise rent in excess of those limits by either (1) resetting the base rent price to market value pursuant to the "vacancy control" provision or (2) raising rents pursuant to owners' right to a "fair return."

### B. The 2025 Vacancy Control Amendment

As relevant here, the primary rent-control exception is a so-called "vacancy control" provision. "A mobilehome park owner shall be permitted to charge a new base rent for a mobilehome space whenever a lawful space vacancy occurs." *Id.* Ch. 6.50.220(A). As originally enacted, the ordinance defined a "lawful space vacancy" to include "the termination of the tenancy of the affected mobilehome tenant in accordance with […] California Civil Code Sections 798.55

United States District Court
Northern District of California

through 798.60[.]" (Dkt. No. 16-2 at 33 (citing the version of Ch. 6.50.220(A)(1) effective August 13, 2025).) Those California Civil Code sections provide a tenancy can be terminated when a tenant is evicted for just cause or the mobilehome owner sells the home. *See generally* Cal. Civ. Code §§ 798.55-798.60. So, in either scenario, as originally enacted, the vacancy control provision allowed park owners to reset rent for a space to market value, *i.e.*, the price the owner would charge in the absence of rent control.

But in 2025 the City amended the definition of "lawful space vacancy." The vacancy control now reads, in relevant part:

> For purposes of this chapter, a lawful space vacancy is defined as follows:
>
> 1. A vacancy occurring because of the termination of the tenancy of the affected mobilehome tenant in accordance with the Mobilehome Residency Law pursuant to Civil Code Section 798.56. Notice given by a tenant to the manager or owner of a mobilehome park sixty days prior to vacating a tenancy pursuant to Civil Code Section 798.59 does not create a lawful vacancy permitting the charging of a new base rent pursuant to this section.

Petaluma, Cal. Municipal Code Ch. 6.50.220(A)(1) (emphasis added). Under the amended vacancy control provision, a park owner may reset rents to market value when a tenant is evicted for just cause, but may no longer do so when the mobilehome owner sells the home pursuant to Section 798.59. *Id.*; *see* Cal. Civ. Code §§ 798.56, 798.59.

**C. Park Owners' Right to a Fair Return**

A park owner may also increase rent above the ordinance's limits to receive a "fair return" on their investments. *Id.* Ch. 6.50.040(E); Ch. 6.50.060. "A park owner has the right to obtain a net operating income equal to the base year net operating income adjusted by" inflation "since the base year." *Id.* Ch. 6.50.100(B). The "base year" is 1993, the year prior to the ordinance's enactment. *Id.* If the owner believes they are not getting a "fair return," the owner may file a petition with the City, which begins an arbitration process. *Id.* "Upon receipt" of the petition, the city "shall, within seven working days, assign an arbitrator" and "set a date for … hearing" between 14 and 60 days after the arbitrator is assigned. *Id.* Ch. 6.50.060(E).

During the arbitration, "park owners shall bear the burden to prove [… by] the

United States District Court
Northern District of California

preponderance of the evidence the reasonable necessity of any rent increase" beyond the ordinance's caps "to earn a reasonable return." *Id.* Ch. 6.50.060(G)(1). The ordinance imposes two rebuttable presumptions: "the net operating income received by the owner in [1993] provided the park owner with a fair return" at the time, and since then, "a net operating income equal to" their 1993 income plus inflation also "provides a fair return." *Id.* Ch. 6.50.100(A), (b). In the arbitration, the parties "may present evidence regarding" the first presumption, *i.e.*, evidence about the park owner's expenses and income in 1993. *Id.* Ch. 6.050.100(C). For instance, the parties may offer and cross-examine witnesses, experts, and oral and documentary evidence about a park owner's "exceptional expenses" for "maintenance and repairs," whether the owner's "expenses were unreasonably high or low notwithstanding the application of prudent business practices," and any "uncollected rents … and bad debts" which are "beyond the control of the owner." *Id.* Ch. 6.50.060(G)(3); Ch. 6.50.100(B), (C). "The hearing need not be conducted according to technical rules relating to evidence and witnesses" and evidentiary rules "may be relaxed at the discretion of the arbitrator in the interest of justice." *Id.* Ch. 6.50.060(G)(3). The arbitrator must submit a "written statement of decision" "within fourteen days of the hearing." *Id.* Ch. 6.50.060(G)(4).

**D. Second Amended Complaint Allegations**

"At a mobilehome park, the park owner owns the land on which mobilehomes are placed. In most cases, the […] residents own the mobilehome and rent the underlying […] space on which the home is placed." (Dkt. No. 34 ¶ 9.) "[W]hen a homeowner decides to move out of a park, he typically will sell the home 'in-place' at the park to a new homeowner, who then becomes the lessor of the underlying space." (*Id.* ¶ 10.)

Plaintiff "is a limited liability company that owns" a mobilehome park in the City of Petaluma. (*Id.* ¶ 4.) The "park has 69 spaces or pads, with mobilehomes on all of them. Each home is currently owned by the resident or residents that live there. Each homeowner rents or leases, from [Plaintiff], the space on which the home sits." (*Id.* ¶ 16.) Plaintiff "acquired the park on April 23, 2024," before the City enacted the Vacancy Control Amendment, and therefore "[t]he price [Plaintiff] paid for the park did *not* reflect" the effect of the amendment, which is "the complete loss of the right to re-set rents to market upon a vacancy." (*Id.* ¶¶ 4, 33.)

To contextualize its takings challenge, Plaintiff alleges details about mobilehome markets. Like homes and cars, every "space at the park has a fair market value." (*Id.* ¶ 13.) "[T]he vast majority" of mobilehomes are "sold 'in-place' at a park," and when those sales occur, "the mobilehome's market value is at least partly a function of the rent paid for the underlying space. All things being equal, the lower the rent, the higher the mobilehome's value." (*Id.* ¶ 15.) A rent control ordinance like Petaluma's "artificially suppresses the rent charged for a space," thereby raising mobilehome sale prices and benefiting mobilehome owners. (*Id.* ¶ 18.)

Plaintiff asserts the impact on mobilehome sale prices undermines the ordinance's "stated purpose […] to improve housing affordability, especially for low-income and middle-income residents." (*Id.* ¶ 25.) The ordinance "artificially suppresses market-based increases for *existing residents* and thereby makes housing more affordable for *that* select group." (*Id.*) And while the Vacancy Control Amendment "is aimed at ensuring that space rents remain artificially low for *future residents* […] and […] those future residents may enjoy artificially low space rents" the prohibition makes "[f]uture residents […] pay significantly higher prices for purchasing the homes[.]" (*Id.*) This, Plaintiff alleges, "undermin[es] the short- and long-term affordability of park residency for incoming residents." (*Id.*)

Additionally, the benefits to mobilehome owners and existing residents come at the expense of park owners like Plaintiff. The Vacancy Control Amendment prohibits resetting rents to market value when a mobilehome is sold or upon a homeowner's departure, meaning Plaintiff "can now almost *never* reset space rents to market levels." (*Id.* ¶ 20.) Meanwhile, "used homes sold in-place at Capri sell for many multiples of their inherent value." (*Id.*) "A variety of factors explain this: Petaluma is an extremely expensive housing market, with a median single family home value over $900,000; the local housing demand far exceeds housing supply; [and] there is a near-zero vacancy rate in the local rental market." (*Id.*)

The combination of these impacts–limiting rent increases while raising mobilehome sale prices–"forcibly transfer[s] substantial wealth from the park owner[.]" (*Id.* ¶ 17.) "[D]ue to the City's onerous rent-control law, [Plaintiff]'s space rents are roughly 40% of their fair market value." (*Id.* ¶ 22.) "Some studies show that for every $100 that rents are *increased*, homeowner

equity decreases by $10,000, though the impact is likely greater." (*Id.*) Plaintiff cites an example of a home "listed for $250,000," even though "the value of the home itself no more than $50,000." (*Id.* ¶ 24.) "The difference–$200,000–is equity forcibly transferred by the City from [Plaintiff] to the selling homeowner." (*Id.*) In total, Plaintiff estimates the "economic impact" of being unable to reset rents is "approximately $3.8 million," or "55% of the park's fair market value." (*Id.* ¶ 32.)

Plaintiff also makes two points regarding its right to petition for rent increases under the ordinance. First, the ordinance's "rent-adjustment procedure […] does not […] eliminate […] the transfer of [wealth] from" Plaintiff because a "fair return" under the ordinance is "significantly less than the increase than an owner could implement in an unregulated market for spaces." (*Id.* ¶ 28.) In other words, "[t]he difference between a market-rate [rent] increase and a 'fair return' increase" is "significant" and therefore does not "change[] or remed[y] the fact the owner cannot raise a space's rent to market" when certain vacancies occur. (*Id.*) Second, "it would be utterly futile" for Plaintiff to petition for a rent increase because the ordinance requires Plaintiff to "establish its inflation-adjusted net operating in 1993," but "few park owners, including [Plaintiff], have 32-year-old records of its net operating income in 1993." (*Id.* ¶ 29.)

## DISCUSSION

The Court previously granted Defendant's motion to dismiss Plaintiff's First Amended Complaint ("FAC"). (Dkt. No. 33.) As relevant here, the FAC alleged Petaluma's ordinance constituted an as-applied regulatory taking under *Penn Central*. The Court dismissed this claim because drawing all inferences in Plaintiff's favor, Plaintiff did not allege facts sufficient to support an inference its as-applied challenge is ripe or an inference the ordinance constitutes a *Penn Central* regulatory taking.

Defendant moves to dismiss Plaintiff's SAC, again asserting Plaintiff's as-applied challenge is not ripe and Plaintiff has not alleged a *Penn Central* regulatory taking. The Court agrees on both points. Given the SAC re-alleges and builds upon the FAC's allegations, the Court reincorporates and repeats the previous order's analysis where relevant.

### I. Plaintiff's Challenge Is Still Not Ripe

"[A] regulatory takings claim is not ripe until the appropriate administrative agency has

made a final decision on how the regulation will be applied to the property at issue." *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1117 (9th Cir. 2010) (en banc). To satisfy the ripeness requirement, "a plaintiff must show is that there is no question … about how the regulations at issue apply to the particular land in question." *Pakdel v. City & Cnty. of San Francisco*, 594 U.S. 474, 478 (2021). The ripeness requirement is "prudential," not jurisdictional. *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 733–34 (1997).

The Court previously dismissed Plaintiff's as-applied takings challenge as not ripe, explaining:

> Drawing inferences in Plaintiff's favor, Plaintiff has not alleged facts supporting an inference its as-applied challenge is ripe because Plaintiff has not alleged whether it petitioned the City to increase rent above the ordinance's annual limits. As explained above, the "primary" factor in Plaintiff's as-applied regulatory takings claim is the economic impact on Plaintiff. *Guggenheim*, 638 F.3d at 1120 (cleaned up). Yet Plaintiff does not specify how much income it has lost, or will lose, due to the vacancy control amendment. Instead, Plaintiff's allegations of an economic impact are based on generalized findings from "[s]ome studies," an allegation rent values are 40% of fair market value due to the entire ordinance, and one example of "a mobilehome for sale at the park" for which Plaintiff "expects" a vacancy "to occur at the park in the next several months." (*See* Dkt. No. 18 ¶¶ 20, 25-27.) While these allegations suggest the vacancy control amendment has at least some economic impact, the ordinance provides a potential remedy to offsets those harms: Plaintiff can petition the City for an arbitration hearing, offer evidence its rental income is not providing it a "fair return," and subsequently earn the right to charge rents in excess of the ordinance's limits. *See generally* Petaluma, Cal. Municipal Code Ch. 6.50.040, 6.50.060. Because Plaintiff has not availed itself of a potential remedy which could reduce the amendment's economic impact, the Court cannot ascertain how "the regulations at issue apply to the particular land in question," namely the degree to which the vacancy control amendment impacts Plaintiff. *See Pakdel*, 594 U.S. at 478; *MHC* [*Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013)] ("[T]he constitutionality of the Ordinance can only be determined by evaluating the totality of its provisions and effects and because […] amendments cannot be evaluated in isolation.")

(Dkt. No. 33 at 16-17.)[2]

---

[2] The parties dispute whether Plaintiff's amended claim exceeds the scope of the Court's permitted leave. Given the Order was unclear as to whether Plaintiff had leave to amend to bring an as-applied challenge, the Court will again consider whether Plaintiff's as-applied challenge is ripe and whether Plaintiff plausibly states a claim under *Penn Central*.

Plaintiff still does not allege it petitioned for a rent increase, and instead alleges facts explaining why its challenge is nonetheless still ripe. First, the ordinance's fair-return procedure "does not […] eliminate" the alleged wealth transfer from Plaintiff because "[t]he difference between a market-rate rent and a 'fair return' increase" is "significant." (Dkt. No. 34 ¶ 28.) Second, petitioning the City would be "futile" because "to make an application" for a rent increase, Plaintiff "must" establish its net operating income in 1993, but Plaintiff does not have those "32-year-old records," which "frustrate[s]" Plaintiff's "ability to prove its case for a […] rent increase." (*Id.* ¶ 29.)

Drawing inferences in Plaintiff's favor, Plaintiff still does not allege facts supporting an inference Plaintiff's as-applied takings challenge is ripe. Plaintiff's first allegation the fair-return procedure does not "eliminate" the alleged wealth transfer is beside the point. The primary *Penn Central* factor inquires into the ordinance's economic impact on Plaintiff, *i.e.*, whether the ordinance creates a "***sufficient*** economic loss" to constitute a regulatory taking. *MHC*, 714 F.3d at 1127–28 (emphasis added). Moreover, *MHC* held "the constitutionality of the Ordinance can only be determined by evaluating the totality of its provisions and effects" and "amendments cannot be evaluated in isolation." *Id.* at 1127. Given *Penn Central* requires courts to examine the *degree* of harm caused by the *totality* of the ordinance, and a successful rent-increase petition could reduce the ordinance's economic impact on Plaintiff, the allegation a petition would not fully "eliminate" one aspect of ordinance's impact (Dkt. No. 34 ¶ 28) does not mean "there is no question […] about how the regulations at issue apply" to Plaintiff. *Pakdel*, 594 U.S. at 478.

Additionally, drawing all inferences in Plaintiff's favor, Plaintiff's allegation the fair-return procedure is "futile" does not meet that burden either. While the ordinance does not explain how Plaintiff, which purchased the park in 2024, would establish the 1993 "base year" net operating income as the predicate to showing it needs a rent increase to receive a "fair return," that uncertainty begs the "question […] about how the [fair-return procedures] apply to the particular land in question," meaning Plaintiff's challenge is unripe. *Id.* Moreover, the ordinance identifies several types of evidence Plaintiff could use in a fair-return arbitration, including "witnesses," "experts," and "oral and documentary evidence." Petaluma, Cal. Municipal Code Ch.

6.50.060(G)(3). And evidentiary "rules may be relaxed at the discretion of the arbitrator in the interest of justice." *Id.* Given the many ways a fair-return arbitration could play out, drawing all inferences in Plaintiff's favor, Plaintiff's allegation the rent-increase procedure is "futile" does not establish there is "no question" about how the rent-increase procedure applies to Plaintiff's "particular" park. *Pakdel*, 594 U.S. at 478.

Accordingly, Plaintiff's as-applied takings challenge is not ripe and the Court grants Defendant's motion to dismiss on that basis.

### II. Plaintiff Does Not Plausibly Allege a *Penn Central* Regulatory Taking

In the alternative, and assuming Plaintiff's regulatory taking claim is ripe, Plaintiff still does not plausibly allege a regulatory taking. *See Guggenheim*, 638 F.3d at 1118 (assuming, without deciding, a regulatory taking claim was ripe). An ordinance is a regulatory taking when it is "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005). "[A] takings challenge to [a] mobile home rent control ordinance […] should be analyzed as a regulatory taking under *Penn Central*[.]" *Guggenheim*, 638 F.3d at 1120.

Courts apply three *Penn Central* factors to determine whether government conduct is a regulatory taking. First, "'[p]rimary among those factors are the economic impact of the regulation on the claimant[.]" *Guggenheim*, 638 F.3d at 1120 (quoting *Lingle*, 544 U.S. at 538–39). The second factor, which overlaps with the first, is "'the extent to which the regulation has interfered with distinct investment-backed expectations.'" *Guggenheim*, 638 F.3d at 1120 (quoting *Lingle*, 544 U.S. at 538–39). "To form the basis of a taking claim, a purported distinct investment-backed expectation must be objectively reasonable," *Colony Cove Properties, LLC v. City of Carson*, 888 F.3d 445, 452 (9th Cir. 2018), and "what is relevant and important in judging reasonable expectations is the regulatory environment at the time of the acquisition of the property." *Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 634 (9th Cir. 2020) (cleaned up). Third, courts consider "the 'character of the governmental action'–for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common

good.'" *Lingle*, 544 U.S. at 539 (quoting *Penn Central*, 438 U.S. at 124).

Plaintiff again asserts the Vacancy Control Amendment is a regulatory taking under the *Penn Central* factors. First, the amendment has a "substantial" economic impact on Plaintiff by suppressing rents, reducing Plaintiff's "future income" by "approximately $3.8 million," which is equal to "55% of the park's fair market value." (Dkt. No. 34 ¶ 32.) Second, Plaintiff reiterates its argument from the FAC the Vacancy Control Amendment "was enacted *after* [Plaintiff] acquired the park" and therefore "undermines [Plaintiff's] reasonable investment-backed expectations." (*Id.* ¶ 33.) In particular, Plaintiff purchased the park expecting "rents could be reset to market following a lawful vacancy," and "the price [Plaintiff] paid for the park reflected" that expectation. (*Id.*) Third, the "character of the governmental action" is akin to a regulatory taking because the ordinance "does not serve its stated purposes;" "restricts only" rents a landowner can charge while not similarly restricting mobilehome sale prices; "does nothing to curb housing costs for future renters;" and "places a high burden on a few private property owners […] instead of apportioning the burden more broadly among members of the public." (*Id.* ¶ 34.)

Binding Ninth Circuit precedent still forecloses Plaintiff's argument on all three factors. As the Court's previous order explained, *MHC* addressed a mobilehome rent control ordinance enacted in 1989 which, like Petaluma's ordinance, tied permissible rent increases to inflation. 714 F.3d at 1122. In 1993, the ordinance was amended "to add 'vacancy control,' which gave any new resident taking over a mobilehome pad lease the right to rent the pad at the same rate as the previous tenant." *Id.* at 1122. Then, in 1999, the government amended the ordinance again to adjust the permissible rent increases. *Id.* at 1122–23. The plaintiff park owner purchased the park in between the original vacancy control provision's enactment and the challenged vacancy control amendment. *See id.* at 1122–23, 1127.

*MHC* held the ordinance did not constitute a regulatory taking. First, the "economic impact" *Penn Central* factor was not met because an "81% diminution in value" was not "sufficient economic loss or interference with [the park owner's] reasonable investment-backed expectations to constitute a taking. Supreme Court precedent has long established that mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Id.*

United States District Court
Northern District of California

at 1127–28 (citing three Supreme Court cases finding no taking when the regulations, respectively, caused an "approximately 75% diminution in value," a "92.5% diminution," and a 90% diminution).

Second, under the "investment-backed expectations" factor, the plaintiff urged it had the expectation it would be able to "increase rent at a rate consistent with the rate of increase in housing costs … that is, [the] expectation was that [the park] would be subject to no rent control at all." *Id.* at 1128 (cleaned up). The district court below agreed, finding the park owner "had no reason to expect that the City would amend the Ordinance, transferring much of the park's value to third parties[.]" *Id.* (cleaned up). The Ninth Circuit ruled that holding was an error:

> "'[T]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.'" *Concrete Pipe* [*& Prods. Of Cal., Inc v. Constr. Laborers Pension Trust for S. Cal.*,], 508 U.S. [602,] 645 [(1993)] Indeed, sitting en banc in *Guggenheim*[ …], we recently held that the "'primary factor,' 'the extent to which the regulation has interfered with distinct investment-backed expectations'" to be "fatal" to the Guggenheims' takings claim, where the Guggenheims purchased a mobilehome park with a rent control ordinance already in place. 638 F.3d at 1120. "[T]he price they paid for the mobile home park doubtless reflected the burden of rent control they would have to suffer. They could have no 'distinct investment-backed expectations' that they would obtain illegal amounts of rent." *Id.* Therefore, this factor also favors the conclusion that no taking occurred.

*MHC*, 714 F.3d at 1128.

Finally, evaluating the "character of the ordinance," *MHC* briefly held the ordinance was "much more an 'adjustment of the benefits and burdens of economic life to promote the common good' than it is a physical invasion of property, and it is only a slight modification to an already-existing rent control ordinance[.]" *Id.* (quoting *Penn Central*, 438 U.S. at 124).

Applying *MHC* here, drawing all inferences in Plaintiff's favor, Plaintiff has not alleged facts sufficient to support an inference the ordinance is a regulatory taking. First, Plaintiff has not alleged facts which plausibly support an inference the "economic impact" of Petaluma's ordinance is sufficient to constitute a taking. Plaintiff asserts the Vacancy Control Amendment will reduce Plaintiff's "future income" by "approximately $3.8 million," equal to "55% of the park's fair market value." (Dkt. No. 34 ¶ 32.) Plaintiff's opposition characterizes this impact as "[a] 55%

diminution in value," (Dkt. No. 36 at 14), but accepting that allegation as true, that economic impact is insufficient to support an inference the first *Penn Central* factor is satisfied because *MHC* held an 81% diminution in value was not sufficient under that factor, relying on three Supreme Court cases finding no taking occurred when a government action caused diminutions of 75%, 90%, and 92.5%.

Second, drawing inferences in Plaintiff's favor, Plaintiff has not alleged facts sufficient to support an inference the Vacancy Control Amendment has interfered with reasonable investment-backed expectations. Plaintiff expressly alleges rent control was in effect when it purchased the park, but alleges it purchased the park expecting "rents could be reset to market following a lawful vacancy," but the Vacancy Control Amendment interfered with that expectation. (Dkt. No. 34 ¶ 33.) Plaintiff's argument is essentially no different than its argument in the FAC: it had a reasonable investment-backed expectation the 2025 Vacancy Control Amendment would not be adopted. As the Court's previous order explained, "Plaintiff's argument is foreclosed by" *MHC* and *Guggenheim*, which held nearly identical expectations were not reasonable as a matter of law:

> In *Guggenheim*, the ordinance passed in 1987, and the park owners purchased the park in 1997. 638 F.3d at 1115. The park owners, like Plaintiff here, asserted the ordinance "transfer[red] … rent … from the landlord to the tenant, and that this had the effect of raising the price of the average mobile home." *Id.* at 1120. The court assumed that impact happened, and noted the ordinance caused that impact before the [owners] bought the mobile home park. Since the ordinance was a matter of public record, the price they paid for the mobile home park doubtless reflected the burden of rent control they would have to suffer. They could have no 'distinct investment-backed expectations' that they would obtain illegal amounts of rent. […] The [owners] bought a trailer park burdened by rent control, and had no concrete reason to believe that they would get something much more valuable, because of hoped-for legal changes, than what they had. *Id.* at 1120-21. Similarly, in *MHC*, the original "ordinance was in effect when [the plaintiff] acquired the property," but the plaintiff challenged an amendment enacted after it purchased the property. *MHC*, 714 F.3d at 1127–28. Relying on *Guggenheim*, *MHC* ruled it was erroneous for the district court to conclude the park owner "had no reason to expect that the City would amend the Ordinance, transferring much of the park's value to third parties" because "'those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.'" *Id.* (quoting *Concrete Pipe*, 508 U.S. at 645).

(Dkt. No. 33 at 14-15.) *MHC* squarely forecloses Plaintiff's recycled argument: Plaintiff concedes

it purchased the park while Petaluma's rent control ordinance was in effect–that is, Plaintiff began "do[ing] business" in a "regulated field," and therefore "cannot object" to Petaluma's "subsequent amendments to achieve the [ordinance's] legislative end." *MHC*, 714 F.3d at 1127-28 (quoting *Concrete Pipe*, 508 U.S. at 645). And, Plaintiff alleges no facts that support a plausible inference it had a reasonable expectation the City of Petaluma would not amend the ordinance to eliminate the ability to charge market-rate rents upon sale of a mobilehome. Instead, Plaintiff relies solely on the fact that when it purchased the park, Petaluma's rent control ordinance permitted it to charge market-rate rent after the sale of a mobilehome. Plaintiff's argument is thus circular; the amendment itself is insufficient to plausibly support an inference Plaintiff reasonably expected vacancy control would not be enacted. Moreover, Plaintiff does not explain how such an expectation could be reasonable given vacancy control provisions were not novel in 2024 when Plaintiff purchased the park, and, in fact, the Ninth Circuit had already ruled vacancy control amendments do not constitute a Fifth Amendment taking. *See MHC*, 714 F.3d at 1122.

Third, drawing inferences in Plaintiff's favor, Plaintiff does not allege facts sufficient to support an inference the ordinance's character is functionally equivalent to a classic taking. Plaintiff merely alleges the ordinance reduces the income it would receive in the absence of the ordinance and that income is reallocated to other actors in Petaluma's housing market. Drawing inferences in Plaintiff's favor, that is insufficient to support an inference the ordinance is "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle*, 544 U.S. at 539. As the Court's previous order explained,

> The ordinance's plain text demonstrates, among other things, its purpose is to limit rent increases for mobile home park tenants, who are primarily low-income or elderly and who have limited bargaining power over park owners in negotiating rent increases. *See generally* Petaluma Cal. Municipal Code Ch. 6.50.010. And the Supreme Court and Ninth Circuit have made clear, without reference to specific facts, a rent control ordinance's effects are not equivalent to a physical or per se taking. See *Yee* [*v. Escondido, Cal.*, 503 U.S. 519, 528–29 (1992)] ("This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails.") (cleaned up); *id.* at 528 ("Put bluntly, no government has required any physical invasion

> of petitioners' property. Petitioners' tenants were invited by petitioners, not forced upon them by the government. […] [A] typical rent control statute will transfer wealth from the landlord to the incumbent tenant and all future tenants. […] This effect […] has nothing to do with whether the ordinance causes a physical taking."); *MHC*, 714 F.3d at 1127–28 (noting the *Penn Central* inquiry is about how "the interference with property can be characterized" and ruling, without reference to specific facts, "the Ordinance is much more an adjustment of the benefits and burdens of economic life to promote the common good than it is a physical invasion of property") (cleaned up)).

(Dkt. No. 33 at 15-16.) Accordingly, given Plaintiff's allegations do not plausibly support an inference any *Penn Central* factor is satisfied, Plaintiff does not plausibly state a *Penn Central* claim.

Plaintiff's arguments to the contrary are unavailing. Plaintiff first emphasizes "'there is no precise minimum threshold' for satisfying the" economic impact factor. (Dkt. No. 36 at 14 (quoting *Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1189 (9th Cir. 2012)).) To the extent there is a "minimum threshold" of harm which satisfies the first *Penn Central* factor, drawing inferences in Plaintiff's favor, Plaintiff's allegations of a 55% reduction in income do not support an inference that threshold is met because *MHC* held an 81% diminution in a mobilehome park's value did not satisfy the first *Penn Central* factor. 714 F.3d at 1127–28. *MHC*'s holding, plus two other holdings on which Plaintiff relies, cited Supreme Court cases finding 75%, 90% and 92.5% diminutions in value did not constitute a taking. *Id.*; *Laurel Park*, 698 F.3d at 1189; *Colony Cove*, 888 F.3d at 451 ("Not every diminution in property value caused by a government regulation rises to the level of an unconstitutional taking. Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. […] Thus, we have observed that diminution in property value because of governmental regulation ranging from 75% to 92.5% does not constitute a taking.") (cleaned up).

Next, Plaintiff relies on several cases to argue its expectation that the Vacancy Control Amendment would not be enacted is reasonable, but those cases are inapposite. First, *Kaiser Aetna v. United States*, 444 U.S. 164 (1979) addressed a government action outright denying access to waters that were historically considered private property, *i.e.*, an action resulting "in an

actual physical invasion." *Id.* at 167–70, 176–80. *Kaiser* expressly distinguished its facts from those here, stating "[t]his is not a case in which the Government is exercising its regulatory power in a manner that will […] devalu[e …] private property." *Id.* at 180. *Kaiser* is therefore inapposite. Second, Plaintiff cites *Bridge Aina* and *Pakdel v. City & Cnty. of San Francisco*, 636 F. Supp. 3d 1065 (N.D. Cal. 2022) to suggest it is "possible for a new regulation enacted in a heavily regulated industry to be challenged under *Penn Central*." (Dkt. No. 36 at 17.) But neither case supports Plaintiff's position because both cases held its plaintiffs' asserted expectations were not reasonable as a matter of law. *See Bridge Aina*, 950 F.3d at 635 (relying on *MHC*'s reasoning a plaintiff "had even less reason to expect that the rent control would disappear altogether"); *Pakdel*, 636 F. Supp. 3d at 1075–76 (noting "Plaintiffs' decision to purchase a [property] and subsequently rent it out represented a choice to enter a highly regulated field" and Plaintiffs "d[id] not adequately allege why" the challenged ordinance "depart[ed] from […] past or conceivable regulatory developments" to an "extreme level"). To the extent a rent-control ordinance can be amended in a manner that interferes with landlords' reasonable investment-backed expectations, Plaintiff cites no authority finding an amendment did so. And, even if Plaintiff has satisfied the second factor since vacancy control was new to Petaluma, Plaintiff still does not state a claim given the other two factors are not satisfied.

With respect to the third *Penn Central* factor, Plaintiff asserts the ordinance does not "merely adjust[] the benefits and burdens of economic life" because it "compel[s] Capri to convey property to an ex-tenant–*i.e.*, the person who sells his or her home and thereby pockets a massive windfall." (Dkt. No. 36 at 18.) Not so. Plaintiff's argument is a non-sequitur. A park resident who "pockets a massive windfall" due to the ordinance is not receiving that windfall because property was conveyed to them. Plaintiff expressly alleges that "windfall" occurs because the ordinance "artificially suppresses" rent, which "artificially increase[s]" mobilehome prices. (Dkt. No. 34 ¶ 15.) That is not a conveyance of property; rather, the ordinance is a quintessential attempt to reallocate the "benefits and burdens of economic life to promote the common good." *MHC*, 714 F.3d at 1128 (quoting *Penn Central*, 438 U.S. at 124).

Plaintiff's remaining arguments about the ordinance's character do not persuade, either.

Plaintiff asserts the ordinance (1) "does not serve its stated purposes," (2) "restricts only" rents instead of mobilehome sales, (3) "does nothing to curb housing costs for future renters," and (4) "places a high burden on a few private property owners […] instead of apportioning the burden more broadly among members of the public." (Dkt. No. 34 ¶ 34; Dkt. No. 36 at 18.) Plaintiff's first three criticisms pertain to the ordinance's effectiveness. Plaintiff cites no authority suggesting those criticisms, if accepted as true, dictate whether a regulation is "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle*, 544 U.S. at 539. Plaintiff's fourth criticism relies on a selective quote from *Armstrong v. United States*, 364 U.S. 40 (1960), which stated the takings clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Id.* at 49. *Armstrong* addressed a forced transfer of title of property, which made the challenger's liens on the property unenforceable. *Id.* at 41. The Court held "[t]he total destruction by the Government of all value of these liens […] has every possible element of a Fifth Amendment 'taking.'" *Id.* at 48. *Armstrong* is therefore inapposite; Plaintiff merely alleges a 55% reduction in rental income from its mobilehome park, not a "total destruction […] of all value" in the park.

Accordingly, the Court grants Defendant's motion to dismiss.

**CONCLUSION**

As explained above, the Court grants Defendant's motion to dismiss. Drawing inferences in Plaintiff's favor, Plaintiff does not allege facts sufficient to support an inference its as-applied takings challenge is ripe or an inference Petaluma's ordinance is a *Penn Central* regulatory taking. As Plaintiff has had the opportunity to amend its claims, and further amendment would be futile, dismissal is without leave to amend. A separate judgment will be entered.

This Order disposes of Docket No. 35.

**IT IS SO ORDERED.**

Dated: August 11, 2026

Jacqueline Scott Corley

JACQUELINE SCOTT CORLEY
United States District Judge